The Full Commission has again reviewed this matter based upon the record of the proceedings before Deputy Commissioner Berger and the grounds set forth in defendant's Motion to Reconsider and Modify the Full Commission Opinion and Award filed April 4, 1999. Defendant has shown good grounds to modify the prior Opinion and Award of the Full Commission. Accordingly, the Full Commission VACATES its April 4, 1999 Opinion and Award.
Upon review of all of the competent evidence of record with reference to the errors assigned, and finding no good ground to receive further evidence or to rehear the parties or their representatives, the Full Commission upon reconsideration of the evidence AFFIRMS in part and MODIFIES in part the Opinion and Award of the Deputy Commissioner as follows:
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the deputy commissioner as
 STIPULATIONS
1. The employee is Leonard Keeling.
2. The employer is the North Carolina Department of Correction, Pender Correctional Institute.
3. The employer is self-insured.
4. The defendant-employer regularly employs three (3) or more employees and is bound by the North Carolina Workers' Compensation Act.
5. At all times relevant hereto, the employer/employment relationship existed between the employee-plaintiff and the employer-defendant.
6. All parties are properly before the Industrial Commission and the Industrial Commission has jurisdiction of the parties and of the subject matter.
7. The date of injury is March 19, 1996.
8. The employee's average weekly wage was $433.11 per week, yielding a compensation rate of $288.64.
9. All other stipulations contained in the Pre-Trial Agreement shall be received into evidence.
10. The following stipulated documents were received into evidence:
a) Employment records marked as stipulated Exhibit 1.
b) Disability records marked as stipulated Exhibit 2.
 c) A job description for a gatehouse officer position marked as stipulated Exhibit 3.
 d) A mediation services invoice marked as stipulated Exhibit 4.
e) A DOC accident report marked as stipulated Exhibit 5.
 f) A set of Industrial Commission forms marked as stipulated Exhibit 6.
 g) An unapproved settlement agreement marked as stipulated Exhibit 7.
 h) A black index containing medical records marked as stipulated Exhibit 8.
***********
Based upon all of the competent evidence adduced from the record, the Full Commission adopts in part and modifies in part the findings of fact of the deputy commissioner and finds as follows:
 FINDINGS OF FACT
1. Prior to his compensable injury by accident, plaintiff had served twenty years in the United States Marine Corps as a drill sergeant. During his last two years of service, he was an instructor who actually trained other soldiers for the position of drill sergeant. Plaintiff served one tour of duty in Vietnam. Prior to his March 19, 1996 injury by accident, plaintiff did not have a history of psychiatric problems.
2. Plaintiff was hired by the defendant-employer in the fall of 1992. At the time of his compensable injury by accident on March 19, 1996, plaintiff had advanced to the position of lead correctional officer. Plaintiff's job duties included supervising other correctional officers and inmates who participated in work duties outside the prison unit. On March 19, 1996, plaintiff was performing his regular job duties supervising inmates on a roadside work detail. While plaintiff was bent over removing a roadside marker from the back of a utility trailer, a gust of wind caused the two hundred pound lid from the trailer to swing down and strike the plaintiff in the area about the backside of his head and left hand. The impact of the lid caused plaintiff to fall to the ground. Plaintiff was transported to the emergency room at Pender Memorial Hospital where he received stitches for a laceration to his head.
3. Plaintiff's March 19, 1996 work-related injury constituted an interruption of his regular work routine and the introduction thereby of unusual circumstances likely to result in unexpected consequences. Therefore, on March 19, 1996, plaintiff sustained an injury by accident arising out of and in the course of his employment.
4. Defendant paid plaintiff under a salary continuation plan during the time period from March 19, 1996 to October 21, 1996, but did not admit liability for plaintiff's injury on a Form 60 or Form 21.
5. Beginning on March 27, 1996, plaintiff began a conservative course of medical treatment under the direction of Dr. Ralph J. DiFiore, an orthopaedic surgeon, for the pain he was experiencing in his neck, the intrascapular region of his back, and his left hand and left ankle.
6. Dr. DiFiore referred plaintiff to Dr. Clarence E. Ballenger, a neurologist, for evaluation of the cause of his headaches. Dr. Ballenger diagnosed post-traumatic headaches, cervical strain or sprain and noted in his records that plaintiff reported slight memory loss.
7. By May 13, 1996, plaintiff's cervical, thoracic and lumbar strains and his injuries to his left hand and left Achilles tendon were resolving. Plaintiff was released to return to work on May 20, 1996.
8. On June 3, 1996, plaintiff called Dr. DiFiore and reported that he had gone back to work on May 21, 1996 and that on or about May 23rd, he experienced increased pain in his neck radiating down to his mid-back. On June 10, 1996, Dr. DiFiore took plaintiff out of work again and scheduled an MRI. The MRI showed a small cervical disc herniation. Dr. DiFiore continued to treat plaintiff conservatively with steroids and medication.
9. On July 16, 1997, Dr. DiFiore recommended that plaintiff be referred to a pain management clinic, but defendant did not comply with this recommendation.
10. Defendant referred plaintiff to Dr. P. Mark Rodgers for a second opinion on August 30, 1996. Dr. Rodgers found that plaintiff's symptoms were more likely related to a soft tissue, nondiscogenic injury which is hard to rehabilitate. He felt plaintiff would slowly get better over a couple of years with encouraged physical therapy and endurance and strengthening training. He further recommended an FCE and vocational rehabilitation.
11. Plaintiff underwent a functional capacity evaluation on October 2 and October 3, 1996 at Physical Therapy Clinic, Inc. In plaintiff's FCE report under the heading "Summary and Test Findings", the examiner reported the following: (1) "Concerns regarding depression, (2) Muscle tone changes; since last seen at the Physical Therapy Clinic, Inc., patients muscle tone has decreased, (3) Sedentary activity level, (4) Recommend behavioral and physical intervention, (5) Will require work conditioning to increase functional capacities."
12. Without the plaintiff's knowledge, Bethanie Gauntt with Key Risk Management Services, Inc. contacted Dr. DiFiore in October, 1996 and asked if plaintiff could return to work. Dr. DiFiore faxed to Ms. Gauntt a written note authorizing plaintiff to return to work within certain restrictions. Key Risk Management Services, Inc. knew that Dr. DiFiore had released plaintiff to return to work before plaintiff knew he had been released. Plaintiff found out about his work release from defendant-employer and not from Dr. DiFiore. The handling of plaintiff's release to return to work by Dr. DiFiore and Bethanie Gauntt caused plaintiff to lose trust in Dr. DiFiore, his own treating physician.
13. On October 21, 1996, plaintiff attempted to return to work at a gatehouse officer position offered by defendant. He attempted to perform the duties of this position for eight hours over a two-day period. On October 22, 1996, plaintiff worked in the position for six hours before having to quit due to the unbearable pain he was experiencing.
14. Bethanie Gauntt did not inform Dr. DiFiore of the specific job duties of a gatehouse officer. One duty of a gatehouse officer was to be able to utilize a firearm in the event of an emergency. A gatehouse officer was also expected to be able to prevent an inmate from leaving the unit with a hostage. Upon reviewing the job duties of the gatehouse officer during his deposition, Dr. DiFiore was of the opinion that he did not think plaintiff could be depended upon to be able to physically fire a weapon if necessary and he would not be able to physically prevent an inmate from escaping or protect himself. Dr. DiFiore further testified that, "[C]ertainly someone in the community wouldn't want someone in his [plaintiff's] condition guarding the gate."
15. The gatehouse officer position was not a suitable offer of employment given plaintiff's physical limitations.
16. Plaintiff has continued to experience pain in all three regions of his back. His symptoms of pain are related to a soft tissue, nondiscogenic injury resulting from his March 19, 1996 work-related injury. Plaintiff's injury is a type that is difficult to rehabilitate.
17. As a result of the March 19, 1996 work-related injury to plaintiff's head and back caused by the direct blow from a two hundred pound lid, plaintiff has experienced soft tissue injuries in the cervical, thoracic and lumbar regions of his back.
18. After listening to the testimony of plaintiff at the hearing, observing his demeanor and considering the other evidence presented, the deputy commissioner found plaintiff's testimony with regard to the severity of his pain to be credible. The Full Commission defers to the credibility finding of the deputy commissioner on this issue.
19. As a result of plaintiff's March 19, 1996 work-related injury by accident arising out of and in the course of employment, plaintiff developed depression that is being treated successfully by Dr. Michael K. Nunn. Plaintiff's depression flowed directly from and is a direct and natural consequence of his injury by accident.
20. The medical treatment provided by Dr. Nunn is medically necessary to give plaintiff pain relief and lessen his disability.
21. As of the date of Dr. Nunn's deposition on October 9, 1996, plaintiff had not reached maximum medical improvement with regard to the soft tissue injuries in his back.
22. Plaintiff has reached maximum medical improvement with regard to his depression.
23. The Full Commission concurs with the deputy commissioner's finding that Dr. Gualtieri's opinions on causation and return to work issues in this matter are unpersuasive. Dr. Gualtieri claims that a person who has a disabling depression does not have the psychic energy to be as angry and bitter as the plaintiff has expressed over the handling of his claim by the defendant. Dr. Gualtieri provided the following professional opinion with regard to the plaintiff's claim that he was unable to perform the duties of a gatehouse officer: "Oh baloney!"
24. As a result of his injury by accident, plaintiff has been temporarily totally disabled from the date of injury through the date of hearing before the deputy commissioner and continuing, with the exception of brief periods when he returned to work May — June, 1996 and in October, 1996. Defendant is entitled to a credit for wages earned upon plaintiff's trial return to work.
25. The plaintiff qualified for short-term disability benefits under the Disability Income Plan of North Carolina, N.C. Gen. Stat. § 135-100 et seq., an employer-funded plan which provides replacement income for employees who become disabled. Any payments made under this plan were not due and payable when made.
***********
Based upon the foregoing stipulations and findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. On March 19, 1996, plaintiff sustained an injury by accident arising out of and in the course and scope of his employment with the defendant-employer in that he sustained soft tissue injuries in the cervical, thoracic and lumbar regions of his back as a direct result of the work assigned. N.C. Gen. Stat. § 97-2(6).
2. As a result of plaintiff's March 19, 1996 work-related injury by accident arising out of and in the course of employment, plaintiff developed depression. Plaintiff's depression flowed directly from and is a direct and natural consequence of his injury by accident.
3. The gatehouse officer job was not an offer of suitable employment. Plaintiff's refusal to continue to work as a gatehouse officer was justified. N.C. Gen. Stat. § 97-32.
4. As a correctional officer, pursuant to N.C. Gen. Stat. § 143-166.14 and § 143-166.16, plaintiff is entitled to salary continuation in lieu of compensation for the first two years of incapacity provided that his employment in the position continues.
5. Plaintiff is entitled to temporary total disability compensation at a rate of $288.34 per week after salary continuation payments end if he is still disabled. Defendant is entitled to a credit for any salary continuation already paid to plaintiff.
6. Plaintiff is entitled to have the defendant pay for all medical treatment that is reasonably necessary to effect a cure, lessen his disability and/or provide him pain relief for his soft tissue injuries to his back and for treatment for his depression. N.C. Gen. Stat. § 97-25.
7. Defendant is entitled to a credit for all salary paid to the plaintiff at any time since the injury of March 19, 1996, and a dollar for dollar deduction for any payments for short-term disability benefits made under the Disability Income Plan of North Carolina, N.C. Gen. Stat. § 135-100 et seq.
***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendant shall pay to plaintiff temporary total disability compensation from March 19, 1996 through the date of hearing before the deputy commissioner and continuing until further order of the Industrial Commission. Said compensation shall be paid as salary continuation for two years from March 19, 1996 or until plaintiff's employment ceases, whichever occurs first, pursuant to N.C. Gen. Stat. § 143-166.14. Thereafter, temporary total disability shall be paid at the rate of $288.34 per week until further order of the Industrial Commission. The portion of this award that has accrued shall be paid in a lump sum subject to the attorney's fee approved below. Defendant shall pay interest of 8 percent from the date of the hearing before the deputy commissioner on this Award.
2. Defendant shall pay for all medical expenses incurred or to be incurred by the plaintiff in the future as a result of the March 19, 1996 compensable injury by accident.
3. Defendant shall receive a credit for all salary paid to the plaintiff at any time since the injury of March 19, 1996, and shall receive a dollar for dollar credit for all payments of short-term disability benefits made under the Disability Income Plan of North Carolina, N.C. Gen. Stat. § 135-100et seq.
4. Plaintiff shall have restored to him any injury-related vacation and sick leave taken.
5. Dr. Nunn is HEREBY APPROVED as plaintiff's treating physician.
6. A reasonable attorney's fee in the amount of twenty-five percent of the compensation due plaintiff under this award is approved for plaintiff's counsel and shall be paid as follows: twenty-five percent of the lump sum due plaintiff shall be deducted from that sum and paid directly to plaintiff's counsel. Thereafter, every fourth check of compensation or salary continuation due plaintiff shall be sent directly to counsel for the plaintiff.
7. Defendant shall pay expert witness fees in the amount of $330.00 to Dr. Gualtieri, $425.00 to Dr. DiFiore and $400.00 to Dr. Nunn.
8. Pursuant to the sanction ordered by the deputy commissioner, defendant may receive an offset in the amount of $165.00 out of the portion of the attorney's fee payable to counsel for plaintiff because he was one hour late for Dr. Gualtieri's deposition.
9. Defendant shall pay the costs due this Commission.
S/_____________ BERNADINE S. BALLANCE COMMISSIONER CONCURRING:
S/_____________ RENEE C. RIGGSBEE COMMISSIONER
Commissioner Scott heard this case but was not available to participate in this decision.
______________________________ CHRISTOPHER SCOTT COMMISSIONER
BSB:md